PETER FIDLER, Plaintiff in Error, *v.* NANCY McKINLEY, Defendant in Error.

ERROR TO FULTON.

In an action for breach of promise of marriage, the defendant may show in mitigation of damages, if the action is brought by the female contracting party, that she was a lewd woman, or otherwise of bad character, in mitigation of damages ; and it is error to instruct the jury that the attempt to make such proof, when the attempt fails, even though made in good faith, should be taken into consideration as an aggravation of damages.

A judgment in such a case will not be reversed because of the amount of damage, unless it is apparent that the jury was prejudiced, or was misled by partiality or some fraud.

Admissions of one of the parties to a marriage contract, obtained under threats by the father of the party injured, with a deadly weapon in his hand, or by the artifice of counsel, should be received and weighed with great caution. (BREESE, J.)

To sustain this action, there should be an offer to marry and a refusal, as well as proof of mutuality in the contract. (BREESE, J.)

Seduction cannot be considered in aggravation of damages, unless the declaration is so framed as to admit such proof, and even then, quere. (BREESE, J.)

THIS was an action of assumpsit, for breach of promise of marriage, tried at the August special term of the Fulton Circuit Court, before BAILEY, Judge, and a jury.

The first count of the declaration is upon a promise to marry on request, the second on a promise to marry in a reasonable time, the third upon a promise to marry in the latter part of the fall or fore part of the winter of 1856, and the fourth on a promise to marry generally.

The general issue only was pleaded.

On the trial, the plaintiff called *Henry Walker,* as a witness, who testified that a case was pending, on complaint of plaintiff against defendant for bastardy, from June 12, 1857, to the 23rd of the same month, at Monterey, before Thomas Kane, a justice of the peace of Fulton county, and that he (witness) was then prosecuting the same as an attorney. That the defendant (Fidler) was under arrest and brought up for trial, and the witness having heard that there was a proposition made to com-

promise, talked to both plaintiff and defendant in regard to it.

The plaintiff then proposed to prove by the witness that the defendant promised to marry the plaintiff at that time, for the purpose of settling the bastardy case. To which the defendant objected, but the court overruled the objection and allowed such proof to be made, and the defendant excepted.

The witness then testified, that he advised the parties that if they married, it would as a matter of law terminate the prosecution for bastardy, then pending; that the case could be continued, and meanwhile defendant could obtain license, and the parties be married, and for that purpose the case might be continued a week. That witness told defendant that he knew what pledges he had made to plaintiff, and he ought to do what was right; that defendant replied that they would have been married long ago if he had been able to get a house to put the plaintiff in. Witness could not state the language used, but thought the defendant agreed to the proposition to continue the case for a week, and gave bond for his appearance the next week, and witness understood the defendant was to get license for the marriage, and be married before the time to which the case was continued. The plaintiff consented to this arrangement. The witness could not state the precise language used.

The defendant then moved the court to exclude the evidence of a promise to marry made while he was under arrest at Monterey for bastardy, and in regard to a compromise of the bastardy suit, but the court overruled the motion and refused to exclude such evidence, to which defendant excepted.

The witness further testified, that at the time to which the case was continued, it was prosecuted, and resulted in requiring defendant to give bond, etc. During the conversation at Monterey, the defendant did not make any complaint against plaintiff on account of her character or chastity, or other objections to her, but said he had no charge about chastity and had made no objections to her.

*Thomas Kane* was then sworn, as a witness for plaintiff, who testified that he was the justice before whom the bastardy case was tried; that he was present at the conversation between Walker and defendant, about a compromise. That defendant said they would have been married long ago, but were not in a situation to do so, and that plaintiff's father had interfered in the matter. That defendant agreed to a proposition made by Walker to withdraw an application for a change of venue, and that the case be continued; that meanwhile defendant was to go to Lewistown and obtain a marriage license and get married. That defendant said that they (plaintiff and defendant) would have been married long ago, but he (defendant) was not situated

as he wished to be, and would have been married now, but plaintiff's father had seemed mad and irritated. Defendant did not deny that he was the father of the child of which plaintiff was then pregnant. He seemed mortified, and said he was the father of the child.

The evidence of Thomas Kane in regard to a promise to marry to settle the suit, etc., made to Walker, was objected to when offered, but the court overruled the objection and allowed the same to go to the jury, to which the defendant excepted.

Plaintiff then called *Thomas J. McKinley*, who testified that he was plaintiff's father; that defendant had visited plaintiff for about three years, commencing September, 1854; that plaintiff was 23 years old; no other person paid such particular attention to her. She was living at her uncle's the most of the time defendant was visiting her. While at witness's house, defendant came sometimes once a week, and sometimes once in two weeks, remaining during the evening. She kept no other company. For about a year before defendant stopped visiting plaintiff, she was making quilts for house-keeping; had procured clothing. In April or May, 1857, witness first heard that plaintiff was pregnant. On the 28th May, same year, he went to see defendant, at plaintiff's request; found him in a cornfield, and asked him what he proposed to do about the trouble he had brought on the witness. Defendant said he did not know what to do—that he had no house. Witness said, "Pete, you know you promised to marry her, and ought to have done it long ago;" to which defendant replied, "he knew he did." Witness told defendant that he could get a house on his (defendant's) father's farm, to which defendant answered, that his brother wanted the house, but that he would go to see plaintiff on the next Sunday and make arrangements and set the time. Defendant did go on that day, but made no arrangements. In the conversation defendant admitted he had agreed to marry plaintiff. When defendant came to see plaintiff on the Sunday referred to, he requested a private conversation, and they both walked out in the yard and sat on a log, talking, for half an hour. Witness did not hear what was said.

On cross-examination, the witness stated that no person was present at the conversation in the cornfield between defendant and witness. The witness told defendant that if he did not marry plaintiff and went away, he (the witness) would kill him if it was twenty years after that. Witness had an open pocket knife in his hand at the time—had been whittling with it. The defendant then said he would go to see plaintiff on the next Sunday and make arrangements. The witness was angry and excited at the time. The witness also stated that plaintiff had

sent him to defendant, and plaintiff was then willing to marry him, and expressed herself willing to marry him at the justice's.

*John McKinley* was then called, and testified that plaintiff was his niece, and that she lived with him pretty much all the time that defendant visited her. Witness's wife is defendant's sister; knew of no one else keeping company with plaintiff.

The defendant has no real or personal property; is unmarried; lives with his father, and works on the farm.

The plaintiff here rested.

The plaintiff then asked for the following instructions to the jury:

1. The jury are instructed, that they are to judge from the facts and circumstances, as sworn to by the witnesses on the stand, whether the seduction proven, if any was proven, was consequent upon the promise of marriage by plaintiff to defendant, if such promise is proved, and if they so find, then the seduction is to be taken by the jury in aggravation of damages in this case, under the first three counts only.

2. That although the jury believe, from the evidence, that the defendant was seen lying on a bed asleep at Thomas Bybee's house, and that there were two young men sleeping in the same bed, unless they further believe, from the evidence, that the defendant refused to marry her on that account, then it constitutes no defense to this action.

3. The jury are instructed that the loss of reputation and character by plaintiff, on account of the wrongful acts of the defendant, and the refusal to marry (if the jury find there was a promise to marry,) and the acts consequent upon such promise of marriage and refusal, are to be taken into consideration by the jury in making up the verdict, and go in aggravation of damages in this case.

5. If the jury believe, from the evidence, that the defendant in this case has attempted to prove that the plaintiff was a lewd or base woman, or was of immoral or bad character, and has failed to establish and prove the same to the satisfaction of the jury, then such charge and failure on the part of the said defendant may be taken into consideration in aggravation of damages in this case.

7. And if the jury believe, from the evidence, that the defendant promised to marry the plaintiff, and that the parent of the plaintiff consented to it in presence of plaintiff, and she made no objection, this is evidence for the jury to take into consideration in determining whether the plaintiff assented to proposition of defendant to marry or not, and is implied consent on her part.

9. In making up the verdict in this case, it is proper for the jury to take into consideration (under the first three counts in

declaration) the wounded and lacerated feelings of the plaintiff, loss of society and character to her in consequence of the promise and refusal of defendant to marry her, the plaintiff, (if the jury so find) and the acts consequent upon said promise of marriage, and give the plaintiff therefor such damage as they may think she is entitled to.

11. The jury are also instructed that it is not necessary for the plaintiff to prove that she, in words, consented to accept the defendant, but the jury may infer such consent from the circumstances of her making no objection at the time of the promise and offer of defendant to plaintiff, (if the jury find that the defendant did so promise and offer to marry the plaintiff,) and her receiving the visits of the defendant in the capacity of a suitor.

12. And that in this action, if the jury find that defendant promised to marry the plaintiff, and if they also find that the said plaintiff carried herself as one consenting and approving of the offer and promise, that this is sufficient evidence of her promise to marry defendant.

If the jury believe, from the evidence, that the defendant entered into a marriage contract with the plaintiff within five years before the commencement of this suit, and under the pretense and promises of marriage seduced and begot the plaintiff with child, and then neglected and refused to marry plaintiff, that circumstances and violation of faith should be taken into consideration by the jury in estimating the damages of plaintiff.

To which and each of them the defendant objected, but the court gave the instructions as prayed for, to which the defendant excepted.

And the defendant prayed the following instructions to the jury:

10. If the jury believe, from the evidence, that the defendant agreed to marry the plaintiff, and that at the time of such agreement the plaintiff had been guilty of fornication with another person, or was an unchaste woman, then the plaintiff cannot recover damages for a breach of such agreement, unless it shall be proven by the evidence that the defendant knew of such bad conduct at the time he so agreed.

11. If the jury believe that the defendant promised to marry the plaintiff, acting under duress, force or fear, then such promise would not be binding upon him.

But the court refused to give such instructions, and the defendant then and there excepted.

The jury found a verdict of $1,350, for plaintiff; and the defendant then moved the court for a new trial, and assigned as reasons, the following:

1st. The verdict is contrary to the evidence and the law.

2nd.   The court granted improper instructions to the jury.

3rd.   The court refused proper instructions.

4th.   The court admitted illegal and improper evidence.

5th.   The damages are excessive.

The court overruled the motion and refused to grant a new trial, to which the defendant excepted.

The court therefore rendered judgment upon the verdict, to which the defendant also excepted.

The plaintiff in error now makes the following assignment of errors :

1st.   The Circuit Court erred in admitting improper evidence on the part of the defendant in error.

2nd.   The Circuit Court erred in granting improper instructions.

3rd.   The Circuit Court erred in refusing instructions prayed by the plaintiff in error.

4th.   The court erred in refusing a new trial, and overruling the motion therefor.

5th.   The Circuit Court erred in rendering judgment against the plaintiff in error for the defendant in error.

Goudy & Judd, for Plaintiff in Error.

L. Ross, and M. Hay, for Defendant in Error.

Walker, J.   This was an action brought by defendant in error against plaintiff in error, for a breach of marriage contract.   The evidence shows that she was delivered of a child recently before the institution of the suit.   On the trial, the jury found a verdict in her favor, and assessed the damages at one thousand three hundred and fifty dollars.   A motion for a new trial was entered and overruled, and a judgment rendered upon the verdict, to reverse which, this writ of error is prosecuted.

We are asked to reverse this judgment because the court below instructed the jury that if they, from the evidence, believed that plaintiff was seduced by the defendant in consequence of a marriage promise existing between them, that the jury should take such seduction into consideration, as an aggravation of damages.   This court held, in the case of *Tubbs* v. *Van Kleck,* 12 Ill. R. 446, that in actions for breach of marriage promise, a seduction, if in consequence of the promise, may be given in evidence in aggravation of damages.   In that case the authorities were fully reviewed, and the decision made on mature deliberation, and we are satisfied that the rule there adopted is correct in principle, and just in its operation, and

are unable to see any reason for its being overruled or modified. Although there is a conflict of authority on this question, we think the weight is with the rule there adopted. The action is given to compensate the injured party for the wrong sustained, and the recovery should be commensurate with the injury done. In a case of a breach of promise, accompanied with a seduction, the injury is infinitely greater than where there is only a breach of promise. When there is a seduction, there is a total loss of character, and all hopes of future happiness and usefulness are blighted, and certain degradation and future misery, if not crime, are its consequences. And when this is produced by a breach of promise, and the fraud perpetrated upon the woman by the man entering into the engagement only to accomplish her seduction, the injury resulting therefrom is the immediate result and consequence of the breach of promise. If he were in good faith to perform his engagement, and keep his promise, such consequences would not result, but when he fails to do so, every consideration of justice requires him to repair the injury, as far as it may be done by adequate damages. This is the result of his own deliberate act, and he has no right to complain if he is required to respond in damages for all the injury he has inflicted upon the woman whose confidence he has betrayed. It is not an answer to say that the father has an action to recover for the loss he has sustained by being deprived of the services of his daughter. For, as the court in that case say, "When he sues for the loss of service he only recovers the damages he may have sustained in the disgrace brought upon his family, in his wounded feelings, or otherwise, and nothing is allowed on account of the suffering and disgrace of his daughter. He pays the father for the injury done him ; if the daughter is permitted to recover, it is for the injury done her, etc. Whatever damages, therefore, the plaintiff suffered in consequence of defendant's refusal to marry her, she is legitimately entitled to recover in this action. How are these damages to be estimated unless we look at the circumstances of the parties, and the situation in which the plaintiff is left by the defendant's refusal to perform his contract?" The plaintiff, in all cases, is entitled to recover all damages which are proximate, and the natural result of the act producing the injury.

The reversal of this judgment was also urged because the court erred in giving the fifth instruction for plaintiff below. That instruction is, " If the jury believe, from the evidence, that the defendant in this case has attempted to prove that the plaintiff was a lewd or base woman, or was of immoral or bad character, and has failed to establish and prove the same to the

satisfaction of the jury, then such charge and failure on the part of the said defendant, may be taken into consideration in aggravation of damages in this case." The defendant, when sued for a breach of marriage contract, may undoubtedly show that plaintiff was a lewd woman, or was of bad or immoral character, in mitigation of damages. And if he makes the attempt to establish such facts, in good faith, under circumstances which induce him to believe that he can make the proof, and fails, he does not by that failure subject himself to additional damages. But when the attack is wanton, or dictated by malice, and only to further blacken the character of the plaintiff, and the attempt is not in good faith, it is a wrong that may be considered by the jury as an aggravation of damages. *Sloan* v. *Petrie*, 15 Ill. R. 426. Such is the rule where the defendant files a plea of justification in slander, and adduces no proof to sustain it, (*Sloan* v. *Petrie*, 15 Ill. R. 426,) or where the defendant has repeated the slander on different occasions from the one for which the suit is brought. And it makes no difference whether the slander is spread upon the record by plea, or is only oral, the aggravation is regarded as the same. And no reason is perceived why the same rule is not applicable to this class of cases. But the rule announced by the court to the jury in this case was too broad, and may have misled them, and it should have been so modified as to leave it to them to determine, from all the circumstances, whether the effort to show that she was a lewd woman, of immoral or bad character, was made in good faith, under such circumstances as to induce the belief that he might reasonably suppose he could establish its truth, or whether it was only a wanton or malicious attack, intended to blacken and further injure the plaintiff's character; and if for the latter purpose, then it would be an aggravation of the damages.

It was also urged that the damages found by the jury were excessive, and the judgment for that reason should be reversed. In cases of this character, it is almost impossible to lay down any rule, by which the measure of the damages can be fixed, with any degree of precision. There is no scale by which such damages can be graduated with certainty. They admit of no other test than the intelligence of the jury, governed by a sense of justice. Such injuries are accompanied with facts and circumstances, affording no definite standard by which such wrongs can be measured, and from the necessity of the case, must be judged of, and appreciated by, the view that may be taken of them by impartial jurors. To the jury, therefore, as a favorite tribunal, is committed the exclusive task of examining these facts and circumstances, and valuing the injury, and awarding

compensation in the shape of damages. The law conferring upon them this power, and exacting of them the performance of the trust, favors the presumption that they are governed by pure motives. It therefore makes every allowance for the difference of disposition, capacity, views and even frailties incident to the examination of such matters of fact, when no criterion can be supplied; and not till the result of the deliberation of the jury shocks the understanding, and leaves no doubt of their prejudice or passion, that courts find themselves compelled to interpose. The moral worth of the parties, their social position and standing in the community, and a great variety of other circumstances and facts, must necessarily be, and generally are, considered by the jury, in estimating the damages in this and all other actions sounding in damages. And in cases of this nature, the jury must be left to exercise a large discretion in awarding damages, and courts have rarely felt themselves called upon to disturb their verdicts, and then, only where it is apparent from the great disproportion between the offense and the finding, that the jury acted under prejudice, partiality, or gross ignorance or disregard of their duty. When a defendant has acted with a total disregard of the rights of others, and in violation of all principles of honor, or from principles of malevolence, the jury are warranted in giving such damages as will make the case an example to others, although these are beyond the real injury sustained by the plaintiff. But in a case like the present, it seems to us, that it would be hard to conceive what would be a compensation for the wrong done. If the seduction was the deliberate purpose of the defendant at the time he procured the marriage contract, such conduct merits at the hands of juries and courts no sympathy; but he should be made to respond in heavy damages—the only compensation which is given by law for the commission of an act, which occasions more suffering, and entails greater disgrace upon the party injured, than any other which can be inflicted.

If it is true, as the jury find, that the defendant below was guilty of a breach of marriage promise with defendant, and that the seduction was induced by that marriage contract, we do not think the damages excessive.

We perceive no other error assigned on this record which we regard as having any force. But as the court below erred in giving plaintiff's fifth instruction, the judgment of the Circuit Court must be reversed, and the cause remanded.

*Judgment reversed.*

Separate opinion of BREESE, J. I concur in reversing the judgment of the Circuit Court in this case, on the whole record,

believing that no sufficient case is made out against the defendant, and because the instructions were all of them against law, and because the damages, even if the plaintiff had a case, are excessive.

In the first place, there is no sufficient proof in the record, that any mutual promises ever existed between these parties to marry at any time. If a man offers to marry a woman and promises to do it, he is not bound to comply with it, unless she agrees to accept him. It takes two to make a marriage contract, as well as any other bargain. If there be a subsisting contract of marriage, and the man delays performance from time to time, she ought not to be allowed to sue, claiming damages, until she has offered to perform on her part, and he dishonestly refuses, and puts an end to the contract, for he might prefer the marriage to the suit, and should have a chance to make his choice.

The only proof about marriage, are the admissions of the defendant under very peculiar circumstances, which should have prompted the court and jury to discard them altogether.

The first admission was made, whilst the defendant was under arrest, on a charge of getting the plaintiff with child, on her complaint that he was the father of it. Her counsel, on that occasion, was Henry Walker, whose testimony is in the bill of exceptions, and, who it seems, was quite indefatigable in his endeavors to get something out of the young man. All that the defendant admitted on that occasion, was, that he, replying to some advice given him by his adversary's counsel, said "that they would have been married long ago, if he had been able to get a house."

Thomas Kane, the justice before whom the defendant was brought on the charge of bastardy, says he heard the conversation between Walker and the defendant, and that defendant said, "they would have been married long ago, but were not in a situation to do so, and that the plaintiff's father had interfered in the matter." The defendant "said he was the father of the child."

The father of the plaintiff, Thomas J. McKinley, testified, that the visits of defendant to his daughter commenced in September, 1854—that she was living at her uncle's most of the time defendant visited her. For about a year before defendant ceased his visits, plaintiff was making quilts for house-keeping, and had procured clothing—he first heard of her being pregnant, in April or May, 1857. On the 28th of May of that year, he went to see the defendant, at plaintiff's request; found him in a cornfield, and asked him what he proposed to do about the trouble he had brought on him, the witness. The defendant

said he did not know what to do—that he had no house. Witness then said, "Pete, you know you promised to marry her, and ought to have done it long ago," to which the defendant replied, " he knew he did." On his cross-examination it appears in this conversation, he told the defendant, that if he did not marry the plaintiff, and went away, he would kill him, if it was twenty years after that ; that he was angry and excited at the time, and had an open pocket knife in his hand, with which he had been whittling. The defendant said he would go the next Sunday to see the plaintiff, and make arrangements. He further says, that after this conversation, fearing the defendant was about to run away, he had him arrested on the charge of bastardy, and had commenced suit in his own behalf, for the seduction, which was pending when this suit was tried. He also states, that the plaintiff, when he, at her request, had this interview with the defendant, was *then* willing to marry him, and expressed herself willing to marry him at the justice's, when under arrest on the charge of bastardy.

It was objected, on the trial, that these admissions should not go in evidence, but the court overruled the objection, and they all went to the jury.

I am inclined to think they should not have gone to the jury, without some remark, at least, from the court, as they can hardly be considered as free and voluntary. Innocent men have been known, in order to escape a threatened and immediate injury, to confess themselves guilty to a charge of murder.

The admission, while under arrest before the justice, was evidently the result of the interference of the complainant's counsel, who plied him so with questions, and, doubtless, so alarmed him as to the consequences of the dreadful deed he had done, that he would have admitted anything. So to escape the infuriated father, alone in a cornfield with him, with a deadly weapon in his hand, what would not a boy admit, under the apprehension of impending peril, with a threat to kill him, if it was twenty years thereafter. Such admissions should have been excluded from the jury, and the court, in regard to those made when arrested, should, at least, have cautioned the jury as to the weight to be given to them. A contract, made under the circumstances these admissions were made in the cornfield, would not be enforced in a court of justice, for it is the law, when the threat, whether of mischief to the person or the property, or to the good name, is of sufficient importance to destroy the threatened party's freedom, a contract will not be enforced, induced by such means. 1 Parsons on Cont. 322. *Foshay* v. *Ferguson,* 5 Hill, 154.

These admissions, thus obtained, comprise all the evidence in regard to a promise to marry, but do not show that there existed, at any time, mutual promises. From McKinley's testimony, I infer, that after she was got with child, and perhaps delivered,—for the proof is defective on that point,—she said she was willing to marry him, which is quite likely. To make this contract binding, there must be mutual subsisting contracts, for a breach of which either party can maintain an action. The proof here, would not sustain an action by the defendant against the plaintiff. Nor is it shown there was any refusal, by the defendant, to marry, or any offer, by the plaintiff, to marry the defendant. The willingness to do so, after she became pregnant, is no proof that a previous promise to marry existed, or that she had, at any time, offered to marry him.

Though courts are very liberal, contrary to my notions of right, in allowing juries to infer a promise to marry, yet they have always required the proof of some circumstances from which it ought to be inferred. Here, there is nothing but the defendant's admission that *he* had promised to marry; none that the plaintiff had promised—she was willing, nothing more, after she was got with child.

Now, as to the instructions, under this proof.

The first instruction assumes a fact which is nowhere proved. There is no proof of seduction by the defendant, caused by a promise of marriage, or a consequence of it. He admitted to Justice Kane, that he was the father of the child, and to him and Walker, that they would have been married long ago, but that they were not in a situation to do so, and that plaintiff's father had interfered in the matter. Nor is there any proof of a promise to marry, until after the plaintiff's pregnancy. We have said in several cases, that instructions must be based on the evidence given, (*Coughlin* v. *The People*, 18 Ill. R. 266 ; *Ewing* v. *Runkle*, 20 ib. 463) ; and there being no evidence, but assumptions only, to support the instruction, it should have been refused ; and the same may be said of the seventh, tenth and twelfth instructions, as there is not a particle of evidence to which they can refer.

But the main objection is to that portion of the first instruction, which, presuming a promise of marriage, and seduction consequent upon it, gives the jury to be informed, that such seduction can be regarded by them, in aggravation of damages, under the first three counts of the declaration.

There is no allegation in any of the counts, under which such evidence is admissible, and on principle I think it is not admissible. The case relied on to support this doctrine, is that of *Tubbs* v. *Van Kleck*, 12 Ill. R. 446.

It will be seen, the opinion delivered in that case, was a majority opinion only, and however highly I respect the judges who concurred, I must say, and will show, it is not based on any authority whatever.

The elementary writers of England, whence we derive our laws, our language and our literature—the books of reports of decisions made by her illustrious judicial tribunals, may be searched in vain for any such doctrine. It is not recognized there, though thousands of cases must there have occurred, to develop it, if it was worthy of recognition. Where, then, and how, did the doctrine struggle into birth?

The first American case, I have been able to find, in which it was announced, though not in the case, and is, therefore, *obiter dictum*, is the case of *Harriet Paul* v. *Peter Frazier*, 3 Mass. R. 71, in 1807. It was an action on the case in the nature of deceit, for that the defendant at, etc., began to court the plaintiff, under a pretense of a design to marry her, and having, under that pretense, gained her affections, got her with child, and afterwards utterly forsook her, whereby she hath been greatly injured in her reputation, hurt in her peace of mind, etc.

On a plea of not guilty, and issue joined, the plaintiff obtained a verdict of one thousand dollars.

The court arrested the judgment, and the plaintiff appealed to the Supreme Court, where it was contended by the defendant's counsel, that no action lay for an injury of the kind complained of, except by the parent or master, who can recover damages for the loss of the service of the daughter or servant only. Of this opinion was the court, and Parsons, C. J., in delivering the opinion, says, "An action of this nature is not given by statute; and there is no principle of the common law on which it can be sustained. Fornication and adultery are offenses in this commonwealth created by statute, and the declaration amounts to a charge against the defendant for deceiving the plaintiff, and persuading her to commit a crime, in consequence of which she has suffered damage. She is a partaker of the crime, and cannot come into court to obtain satisfaction for a supposed injury to which she was consenting." This was an end of the case, but the chief justice proceeds to say, "It has been regretted, at the bar, that the law has not provided a remedy for an unfortunate female against her seducer. Those who are competent to legislate on this subject, will consider, before they provide this remedy, whether seductions will afterwards be less frequent, or whether artful women may not pretend to be seduced in order to obtain a pecuniary compensation. As the law now stands, damages are recoverable for a breach of promise of marriage; *and if seduction has been practiced under*

*color of that promise, the jury will undoubtedly consider it as an aggravation of the damages. So far the law has provided; and we do not profess to be wiser than the law."*

The syllabus of this case by the reporter is as follows: " No action lies for a single woman against one for seducing her and getting her with child under pretense of a design to marry her, no promise of marriage being alleged."

It will be seen what was said by C. J. Parsons, which I have italicised, is mere *dictum*, yet it has been made the foundation of the doctrine I am endeavoring to combat.

It will be observed no authority whatever is referred to for the *dictum*, nor reason urged why the law should be as stated. The Chief Justice stated truly, that as the law then stood, damages were recoverable for a breach of promise of marriage, just as for the breach of any other promise. The rest of the sentence, and which this court has taken as authority, is mere *dictum*—not in the case, and unsupported by a single reference. An eminent jurist has said, and I cordially agree with him, that mere *dicta* are dangerous guides, and if listened to as authority, they become highly prejudicial to free investigation and accurate science, and when any great principle of law is under discussion, it is safest to recur only to the decision of adjudged cases, and to such as involve the point in controversy.

The next case in the order of time, in which this doctrine is advanced, was in 1814, the case of *James Conn* v. *Eliza Wilson*, 2 Overton (Tenn.) R. 233. It was assumpsit on a promise of marriage, and the principal error assigned was, permitting, as in this case, evidence to be given, under the general issue, of seduction, and getting the defendant (in error) with child.

The court decides the evidence admissible, solely on the authority of the case of *Paul* v. *Frazier*, 3 Mass. R. 72, referring, however, to another case in the same court, of *Boynton* v. *Kelly*, 3 Mass. R. 189, in which last case, the question was not made, and the only point mooted and decided was, that in an action for a breach of a promise of marriage and for seduction, the defendant cannot give in evidence, the general bad character of the plaintiff between the promise and the breach, in mitigation of damages. The learned judge, in *Conn* v. *Wilson*, says, these cases of *Paul* v. *Frazier*, and *Boynton* v. *Kelly*, " demonstrate that it was proper to receive this evidence in aggravation of damages." No other authority is referred to, and I can only say, that if those cases are a satisfactory " demonstration " that the evidence was proper, that court required very little to satisfy it. And this case is cited as authority in *Tubbs* v. *Van Kleck*. The next case, also cited as authority, is the case of *Whalen* v. *Layman*, 2 Blackf. R. 194, and it is based on the

two cases from Massachusetts, *Paul* v. *Frazier*, and *Boynton* v. *Kelly*.

The only other case I have found, is *Green* v. *Spencer*, 3 Missouri R. 319, (225, new series,) and that is based on *Paul* v. *Frazier*, *Boynton* v. *Kelly*, and the Tennessee case of *Conn* v. *Wilson*, a mere emanation from them.

When, in the case of *Paul* v. *Frazier*, the court had decided the action was not maintainable, there was an end of the case. The Chief Justice says she was a partaker in the crime, and should not come into court to obtain satisfaction for *a supposed injury to which she was consenting*. His subsequent dictum seems at war with the decision, for if she could not come into court claiming directly, damages for her own turpitude, how could she do it indirectly, in an action for a breach of marriage promise ? This case of *Green* v. *Spencer*, is used also by this court to prop up the case of *Tubbs* v. *Van Kleck*, and as they are all bottomed on Ch. J. Parsons' *dictum*, it may be safely said, all these cases are without authority, as they are clearly against well known principles of law, governing actions of assumpsit. That action will not lie, when the consideration of the promise was illegal or contrary to the policy of the law. A court, therefore, cannot, consistently with principle, permit a plaintiff to give in evidence, to aggravate damages, an illegal consideration, or one contrary to the policy of the law, when an action on a consideration of such a character cannot be maintained. The plaintiff is a partaker in the crime—she is a willing party to it, and to her own injury, and if she cannot maintain an action under such circumstances, as Ch. J. Parsons says she cannot, how is it, on what principle can she give it in evidence in another action, and thereby effect the same object ? Chief Justice Treat, in *Tubbs* v. *Van Kleck*, presented the true view of such cases. He went upon established authorities, not mere *dicta*, and those *dicta* at war with the very decision pronounced in the case.

In cases of this kind, for a breach of promise to marry, it must be remembered, the female is the sole beneficial party, and she alone can bring the action. Her seduction forms another and distinct cause of action, the only remedy as yet provided by law in this State, being an action, by the father, for the expenses attending her lying in, if she has been confined, and loss of service. As Chief Justice Treat says, "They are separate and distinct causes of action, founded on entirely different considerations, and accruing to different persons." No case can be found, in which, in the action by the father, a breach of the contract to marry has been taken into consideration by the jury, nor, in the action by the daughter, for breach of promise, her

seduction, except in the few ill-adjudged cases on which I have commented. Should the daughter be allowed to do so, the recovery would be no bar to an action by the father, and, consequently, the defendant might be subjected to double damages for the same act.

The Chief Justice further argues, that it would be permitting her to recover for an immoral act, in the doing of which she equally participated. The parties are in *pari delicto*. If the plaintiff has been debauched, it was the result of her own voluntary consent. It is contrary to the policy of the law, to give one guilty party a remedy against an associate in crime or immorality.

Having now referred to all the cases in which evidence of seduction has been allowed, in an action of assumpsit for a breach of a promise to marry, and having seen that they all, without a single exception, have nothing but the *obiter dictum* of Judge Parsons to rest upon, I will now cite a few cases, in which the rules and principles of law and evidence have been duly regarded, and a conclusion, of course, totally different reached. The first, is the case of *Burks* v. *Shain*, 2 Bibb (Ky.) R. 343, a most exalted tribunal, favorably comparing with any other of that day.

The action was upon a promise of marriage, and the question arose, on a bill of exceptions, taken by the defendant, to the court's refusing to instruct the jury to give no damages for the seduction. In the case before us, the court did instruct the jury to give such damages.

The Supreme Court of Kentucky, say : " It was unquestionably a wrong in the defendant to have debauched the plaintiff, but it is a wrong of which she was *particeps criminis,* and had no right to complain in a court of justice. Besides, it appears that her father has brought suit for the seduction, and the consequent expense and loss of service. In that suit, the tort in seducing the plaintiff, is the ground of the action, and as it was aggravated or otherwise, would tend to increase or diminish the damages which the father ought to recover. But the action by the daughter, arises solely and exclusively upon the contract to marry ; nor is there any allegation, either general or special, under which testimony of the seduction is admissible. We may add to these considerations, that the promise attempted to be proved on the trial, was made at a period subsequent to the seduction, and of which the seduction might have been the cause, but could not have been the consequence."

Another case, sustaining the view I take of this doctrine, is in 2nd Penn. State R. 80, *Weaver* v. *Bachert*. This was an action for a breach of a marriage promise, wherein this point was dis-

tinctly made. Chief Justice Gibson, in delivering the opinion of the court, says: " The decision of the point before us, by the Supreme Court of Kentucky, in *Burks* v. *Shain*, 2 Bibb, 343, seems to be founded in the true principles of the action." He says, " Illicit intercourse is an act of mutual imprudence, and the law makes no distinction between the sexes, as to the comparative infirmity of their common nature. A woman is not seduced against her consent, however basely it be obtained, and the maxim, ' *volenti non fit injuria*,' is as applicable to her as to a husband whose consent to his own dishonor bars his action for criminal conversation." This maxim, as he says, and we all know, extends to contracts in the forming of which the parties are equally culpable, the consideration being immoral or illegal. If then, he asks, a woman cannot make her seduction a ground of recovery, directly, how can she make it so indirectly ? In commenting on the cases I have cited, of *Paul* v. *Frazier*, and *Conn* v. *Wilson*, he regards them as of no authority. In *Tullidge* v. *Wade*, 3 Wilson, 18, and in *Foster* v. *Scoffield*, 9 Johns. 298, it was held, that in an action, by the father, for the seduction of his daughter, the daughter cannot be a witness, to prove a promise of marriage, in order to increase the damages, for she has herself a right of action against the defendant. The father's action is for a *tort;* that of the daughter, is for a breach of the contract made between her and the defendant.

The converse of this proposition is stated in *Burks* v. *Shain*, and in *Weaver* v. *Bachert*, and is unquestionably the law of the case.

Chief Justice Gibson says, as Chief Justice Treat said, in his dissenting opinion, in the case of *Tubbs* v. *Van Kleck*, " If a father could give such evidence, in his action for the seduction, and if the daughter could give evidence of seduction, in her action on the promise, the defendant would be doubly exposed to vindicatory damages. The bastardy ought, therefore, to have been excluded from the evidence and the charge." The case of *Baldy* v. *Stratton*, 11 Penn. State R. 321, recognizes the same doctrine, and none can deny that they are not founded on correct principles.

The action before us, arose solely and exclusively upon the contract to marry, and there is no allegation whatever in the declaration, under which proof of seduction could be admitted. I may add, that no express promise to marry was proved on the boy, as having been made prior to the supposed seduction. The only proof on that point is, when he was arrested on the charge of bastardy, and while the investigation was proceeding, being badgered by the complainant's lawyer, he did admit he had promised to marry the woman, and would marry her, but had no

place to put her in; and again when he was in the corn-field, where he said,—when the father came to him much excited, and declared if he did not marry her before he went away, he would kill him, if it was twenty years after that—that he had an open pocket knife in his hand at the time, with which he had been whittling—that he was angry and excited at the time,—that he would marry her, but had no house.

No authority can be found for the doctrine, save the *dictum* of Judge Parsons, that in an action for breach of a contract, the party complaining can recover vindictive or exemplary damages. As a general rule, a plaintiff in such action is only entitled to receive such damages from the defendant as will compensate him for the loss of the contract. The old common law never allowed the injured party, even in actions *ex delicto*, to recover, in addition to an adequate compensation for the injury sustained, damages by way of punishment to the wrong-doer. 2 Parsons on Cont. 446–7. By what argument then, can it be maintained, that in an action of assumpsit for the breach of a contract, such damages can be given? Whoever before heard of vindictive or exemplary damages in such an action? With as much propriety could a party suing in assumpsit for a breach of warranty on the sale of a horse—that he was gentle and free from vice—recover vindictive damages, on proof that the horse had bit and kicked, or otherwise injured the purchaser, and recover to the extent of those injuries, and for his nursing and cure.

A contract and its breach, is one thing; a tort and its consequences, another and quite a different matter, and are governed by different rules. It is not good policy, nor is it expected of courts, that they will attempt to wipe out the distinction between actions which have been so long recognized, and which alone the law-making power can rightfully do. Judicial legislation has no favor with me. It savors of usurpation.

Having considered the proof and the instructions, and the authority on which the most important one was based, I will now make a few suggestions in regard to the damages assessed.

It is, I believe, a settled principle, in cases like this, that if there be an imputation upon the character of the plaintiff, that fact should go, if not to the whole action, at least in mitigation of damages.

The testimony of Mr. Tybee, a witness for the defendant, fully establishes such an imputation, and though he says he never informed the defendant of it, yet the defendant may have been informed by Crawl or Floyd of the fact, and it may have operated with him to break the contract of marriage. At any rate, it is an imputation upon her character, and how a jury, under it, could

give the damages they did give, I cannot understand, and must refer it to passion, prejudice and perverseness on their part. Even if there was no such imputation, the damages are outrageously excessive, and the young man, unless very successful in his "battle of life," must be cramped in all his undertakings, and remain poor.

I concede that respectable courts have said that actions of this kind, though assumpsit, on a promise to marry, partake of the character of actions *ex delicto.* In this view it is, that juries have been permitted to regard the social position of the parties—any improper conduct of the defendant in which the plaintiff herself has not participated—such as his heartless, unprincipled and insulting conduct towards her, calculated to wound her feelings, and aggravate the distress his broken faith may be supposed to have brought upon her. The vanity and pride of most females, if they be virtuous, and have a good social position, are supposed to be severely shocked by the rec-reancy of one on whose plighted faith they had reposed, and something in the way of money must be given them, if they ask for it, to salve, if not to heal, the wounds thus inflicted. Considering these matters as legitimately connected with the alleged promise and its breach, I doubt, however, if a really good and virtuous woman has ever brought, or ever will bring, such a suit. Such actions are the resort, most generally, of the immodest, the mercenary—of those wanting in delicacy of sentiment, and fear not to bring their own shame before the public. The virtuous, modest woman, who has been deceived and deserted by her lover, will brood in secret over her wrongs, and shed many a bitter tear over disappointed hopes and broken vows, but she will not trouble courts or juries with them, or hire lawyers to blazon them to the world. It may be her death wound, but she will hide in her own pure bosom, the barbed arrow that inflicted it. Considering, contrary to all principle, the action as for a tort, it follows, if a woman will sue, the jury have quite a large discretion in measuring the damages, but their "sense of justice" and "intelligence" is poor dependence indeed, if they are not confined within some limit, for feeling, not reason, is too apt to sit in judgment, as this case shows.

My view is that once an action *ex contractu,* it should be so regarded throughout all its stages, and when it is proved that a contract to marry has been legally made, by parties capable of contracting—that there are mutual promises—and no fraud or circumvention practiced, and no imputation upon character, and a readiness to marry or offer to do so, shown, and no cause appearing to justify a refusal to perform the contract, materials for the formation of a proper verdict should be found in this consid-

eration,—what is the value of the contract? This of course depends in a great degree on the circumstances of the parties.

The wealth of the defendant would contribute essentially, in these mercenary times, to swell the value of the contract, and enhance the damages for its breach, for as a general fact, it may be safely asserted, that a contract to marry a rich man, all else being equal, is of more value, as the world goes, than a contract to marry a poor man. Putting such a case, the plaintiff herself being free from fault and causelessly deserted, fairly before an honest jury, no danger need be apprehended of the result. We have a striking instance of this, in a late case in an adjacent State, where the fair plaintiff—a reputable spinster—recovered a verdict of one hundred thousand dollars, the defendant having been proved to be worth near a million. This, doubtless, was a suit on speculation, as such cases generally are, and money was the object. I don't believe, myself, that the feelings of the plaintiff were very much lacerated by the desertion of her lover, with the frosts of sixty winters on his head, or that they had anything to do with the suit, or that the jury considered that, in making up their verdict. They looked at it as a valuable contract, which she had lost, and awarded accordingly.

Another element of a proper finding, would be the expenses which the plaintiff had necessarily incurred preparatory to her marriage,—providing proper apparel, furniture for housekeeping, in short, all necessary outlays and unavoidable expenses she may have incurred, suitable to her rank in life, and which may be proved.

These all grow out of the case, as one of contract, and courts should always restrict the proof to the contract. So far as it is made to partake of a tort, the jury are necessarily on a sea of uncertainty and conjecture, with no compass to guide them, and courts lament the difficulty of applying any certain rule by which to ascertain the damages.

This lamentation would not be necessary, if courts would adhere to principle, and not be led astray by a reported case founded on *dictum* only, though it may have the odor of popularity about it. Principle should never be departed from, nor should courts break down, by their rulings, those plain distinctions between actions, which the wisdom of ages has approved. If they overwhelm an unfortunate defendant, he must submit, the doctrine being that courts cannot interfere in such cases. My opinion is, and always has been, that in such cases the courts are bound to interfere, for the protection of the individual. By such interference, the court does not fix the amount of the verdict, but simply submits the case to the consideration of another jury. If the present action, with the principles applicable to it, does not

afford females, who complain of breaches of such promises, accompanied by seduction, a full and complete remedy for the wrong done them, the legislature, as some States have already done, must supply it by more effective enactments. As the law now is, on a breach of promise of marriage, the female ought only to recover as on an action *ex contractu.* For the tort done, the father or master, if she be a servant, has the action—she is not, in such case, the meritorious cause, but can be made so by the legislature.

On this whole record, believing that great injustice has been done, and great errors committed, I am for reversing the judgment, and remanding the cause.

*Judgment reversed.*