## John W. Poehlmann v. Barbara Kertz.

105   249
a204s 418

1. EVIDENCE—*Of Seduction Admissible in Action for Breach of Promise of Marriage.*—Evidence of seduction in an action for breach of promise of marriage is admissible, though the seduction is not charged in the declaration. It is not necessary to plead that which is merely evidence.

2. DAMAGES—*In Actions for Breach of Promise of Marriage.*—The jury in cases of breach of promise of marriage are entitled, when they find the contract of marriage made and broken, to take into consideration all the facts and circumstances of the case, and particularly the conduct of the defendant in his whole intercourse with, and treatment of, the plaintiff.

**Breach of Promise of Marriage.**—Appeal from the Superior Court of Cook County; the Hon. JOSEPH E. GARY, Judge presiding. Heard in the Branch Appellate Court at the October term, 1901. Affirmed. Opinion filed December 30, 1902.

**Statement.**—This was an action begun by Barbara Kertz, appellee, against John W. Poehlmann for breach of promise of marriage contract. Judgment was entered upon the verdict of the jury assessing damages at $2,500. Attorney for appellant urges in his argument two grounds of error: first, that the court admitted evidence of seduction although not specially pleaded; second, that an instruction on seduction was improperly given. In discussing these alleged errors, all the assignments of error made by appellant, so far as may be found necessary, will be discussed. Mr. Poehlmann was a florist and a widower with two children, three and four years of age. In 1894 he first met Barbara Kertz, the plaintiff, at his brother's home. She was there employed as a domestic. After an absence of some years she returned to work in his brother's family in June, 1898. Plaintiff (appellee) testified as follows:

" In August, 1898, I was preparing to leave for a few days, when the defendant asked me to be his housekeeper. The next morning he asked me if I would sooner get married to him. I said, ' I will see about it.' Several weeks later he said, ' Have you thought that matter over we were speaking about?' I said, ' If you want to marry me you will

have to marry a poor girl without money.' He said, 'I am not looking for money now.' Besides, I said, I am a Catholic and you are a Protestant. He said that made no difference. After that he said, 'Do you really object to marrying me? Will you promise to marry me?' I said, 'I will promise to marry you.' He then asked me if I did not want to go to some summer resort; he said he would give me the money. When I was going home he said, 'You come down to the store to-morrow and we will go out to Jackson Park and spend the day before you go.' We spent the time in the store until the train left. At the depot he bought me flowers and fruit, and asked me to write. I did write him and had two or three letters from him. He wrote he was coming up to see me on August the fifth. I met him at the depot. He bought me flowers and gave me a diamond ring. He said, 'Here, I have a ring for you which I ought to have given you long ago.' I asked him what Mrs. Poehlmann (his brother's wife) said about it when he told her and he said she felt badly about it, to think she had been such a good friend of mine and I did not tell her anything about it. He then objected to my going to work; said if I wanted to work, to go and keep house for him. He left on the sixth; he said he could not stay longer on account of business. On the way to the depot he said, 'You ought to write first.'"

Plaintiff wrote to defendant on August 22, 1899. Defendant never answered this letter. Plaintiff further testifies:

"I came to Chicago and went to work on the 12th day of September. The first opportunity I had, I went to the store and found the defendant. He said, 'I suppose you came down to find out what the matter is.' I said, 'Yes.' He said, 'Barbara, I have changed my mind.' I said, 'What is the reason for this?' I asked if my parents were not in the circumstances he expected. He said, 'No, I expected things different.' He said, 'When I came up to visit you, you did not have some present for me and not a decent meal on the table.' I said, 'You are a different person from what I expected to be dealing with entirely, and that gives me to understand what you are saying, what you mean.' I turned and went out. That same evening I wrote him a letter and asked him what his real reason was, but I never heard from him afterward. Before I left for home he told me that I had better tell my folks about getting married,

because he intended to come up, and I told my folks. He then said he would like to get married in three weeks."

Defendant wrote to plaintiff July 24, 1899, and another letter a few days thereafter, wherein he states as follows:

" I do wish you were here so we could chat together about our future plans. Well, I don't expect to be alone very long any more, that's one consolation. It will be more pleasant after we are once married and settled. Have you told your folks already? If not you had better tell them; might come up to see you next Saturday. Say, old girl, you sent lots of kisses for the babies; where do I come in? I suppose I will have to wait for the genuine ones, but I will have some extra ones coming, and don't forget it. Yours forever. Many kisses from me and the babies."

Letters in the most affectionate terms were written by defendant to plaintiff prior to the time of defendant's visit to plaintiff's home on the 5th of August, 1899. In May, 1899, defendant said:

"'Wisconsin has taken out a license for marriage; that spoils the couples from going down there; we will go over to Michigan, and get secretly married. Then we can go to housekeeping when we feel like it.' I told him it was not very nice to get married secretly, that Chicago was good enough for me, and he says, 'if it is good enough for you, it is good enough for me.'"

Defendant testified that his first conversation on the subject of marriage was in January, 1899, and he testified:

" I took a liking to the girl and said to her, I might make up my mind to get married to her. If I said anything to her in May, 1899, about marrying her, it was maybe in a joke. About July the 15th, 1899, I told her to come down to the store and see me before she went away. Told her I was going to come up and see her, and she asked me what my intentions were in regard to getting married; I said, I could not make any promise to her because I wanted to get acquainted with her folks. I did not see anything wrong with her. I went up to Port Washington to see her. On the way from the depot to her home I gave her the ring. She asked me if I was hungry; I said I was. She said she would get supper for me. All we had was beer, a piece of sausage and some bread. She said she would get me some pie or cold coffee. I said I did not care for either. After

the old folks retired, and between twelve and one o'clock, I asked her if she had intercourse with any other man; I want to know it before I go any further. She told me that she was engaged when she was about sixteen years old to a man with whom she had been going for about three years and that she had had intercourse with him; that he went out west and was shot."

Mr. Weirich, a barkeeper, testified in behalf of defendant that in 1894 he had intercourse with the plaintiff. Plaintiff in rebuttal testified that she did not at any time have intercourse with the witness, Weirich. Attorney for plaintiff asked: " Did you ever have sexual intercourse with any man?" Answer: "Mr. Poehlmann, the defendant." Objection by defendant.

The Court: "If you had objected to the question, I would have sustained the objection; but having waited until the answer came, it was too late."

Plaintiff further testified as follows:

"Defendant asked me if I would grant him favors. He said, 'I will buy you just as nice diamonds as any woman wears in Chicago.' I said, 'I am not looking for any diamonds, I don't intend to do any such thing.' He said, 'Well, what need you be particular, for we will get married anyway.' And upon his saying that I yielded to him about a day or two thereafter, when he again repeated that he would marry me."

OSCAR HEBEL, attorney for appellant.

McCLELLAN & SPENCER, attorneys for appellee.

MR. JUSTICE BURKE delivered the opinion of the court.

After reading the evidence introduced in this case, no doubt can be entertained that the defendant, appellant, did promise to marry the plaintiff. It is true he makes denial, and says that if he made a promise of marriage "it was maybe in a joke." His statement that he gave her a diamond ring and talked with her after the midnight hour alone in a manner as no man would, and his written admission of agreement to marry plaintiff, together with the other evidence in this case, convinces us that he had prom-

ised to marry her and even anticipated some of the marital rights.

An examination of the evidence will, we think, completely refute the suggestion of appellant, that the promise of marriage by defendant was made in consideration of sexual intercourse; we therefore find that the promise of marriage in this case was not based upon any immoral consideration and that the court did not err in refusing to exclude the evidence and instruct the jury to find the issues for the defendant.

There is no averment of seduction in the declaration in this case. It is therefore contended by appellant that evidence of seduction can not be received, since it has not been specially pleaded in this case, and because the law does not imply that damages for seduction are a natural result of a breach of promise of marriage.

In Fidler v. McKinley, 21 Ill. 308, is found a case similar to the one at bar. The declaration therein contained no averment of seduction, and yet the court allowed evidence of seduction and specifically instructed that the seduction might be taken into consideration by the jury in aggravation of damages. The argument of counsel for appellant, that evidence of seduction was improper in this case and an instruction permitting the jury to consider seduction in aggravation of damages should not have been given, was very vigorously stated in a dissenting opinion of Judge Breese. But the opinion of the court in Fidler v. McKinley remains the law of this state on these subjects, and is, therefore, decisive of these questions. In this case the court further says:

"In the case of Tubbs v. Van Kleek, 12 Ill. 446, the court held that in actions for breach of promise of marriage, a seduction, if in consequence of a promise, may be given in evidence in aggravation of damages. In that case the authorities were fully reviewed, and the decision made on mature deliberation, and we are satisfied that the rule there adopted is correct in principle and just in its operation, and are unable to see any reason for its being overruled or modified."

In Lowden v. Morrison, 36 Ill. App. 495, it is held that evidence of seduction in an action for breach of promise of marriage is admissible, though the seduction is not charged in the declaration. It is not necessary to plead that which is merely evidence.

The weight of authorities in other states is that general allegations of a promise to marry and its breach, will permit evidence of seduction. 3d Am. & Eng. Ency. Pl. & Pr. 688, and cases there cited under article, Breach of Promise of Marriage.

The record bearing on the subject of seduction shows that evidence relating thereto was brought out through the attempt of appellant to prove that plaintiff was not virtuous. The counsel for appellant did not object to the question which called out the answer that plaintiff had intercourse with defendant. In considering this portion of the case, we think no injustice was done the defendant. The verdict of the jury was $2,500, and is claimed by appellant to be excessive. In Thorn v. Knapp, 42 N. Y. 474, it is said, that "if the defendant comes into court and attempts to prove the plaintiff guilty of misconduct with other men of which he knew she was not guilty, or when the misconduct was committed with himself, it aggravates the injury and aggravates the claim to damages." This proposition is based on the principle that the jury in cases of breach of promise of marriage were entitled, when they found the contract of marriage made and broken, to take into consideration all the facts and circumstances of the case, and particularly the conduct of the defendant in his whole intercourse with and treatment of the plaintiff.

There is evidence in the record tending to show that defendant was a man of experience in the world; had children of his own; promised the plaintiff to marry her; caused her to make public announcement to her family and friends of her engagement, and after the assurance of marriage, led her to surrender her person to his passion, and then, upon the flimsy pretext that her parents were a little poorer than

he had supposed, abandoned her. It is entirely probable that from this evidence the jury may have believed that defendant had no regard whatever for the person and virtue of a woman who had trusted him and whom he had ruined and brought into disgrace among her friends in Chicago, and at the home of her parents in Wisconsin. In this class of cases a jury is particularly fitted to determine the amount of the damages, and we see no reason in this case to disturb their verdict.

The principal objection of appellant to the instructions of law is that they do not accurately state the elements of damage which the jury might properly consider in fixing the amount of their verdict.

In view of the position taken in this opinion we shall not extend it by a further discussion of these instructions, but say that in them we find no reversible error.

Judgment of the Superior Court is affirmed.